LOUIS W. MERRIFIELD *et al.*

*v.*

THE CANAL COMMISSIONERS *et al.*

*Opinion filed October 24, 1904—Rehearing denied December 9, 1904.*

1. RES JUDICATA—*when adjudication is conclusive as between the parties.* Adjudication by a court of competent jurisdiction of one of the material questions in the suit is final and conclusive of that question in a subsequent suit between the same parties, even though the former judgment may not constitute a complete bar to the subsequent suit.

2. SAME—*when lessor may act on strength of adjudication between lessees.* Where lessees of water power from the Illinois and Michigan canal commissioners submit to a court of competent jurisdiction the question of the quantity of water to which one of the lessees is entitled under the original contract by which the commissioners acquired their rights, the judgment of the court upon that question, while in force, may be acted upon by the commissioners in regulating the supply of water to such lessee.

3. SAME—*when question of manner of receiving water is not adjudicated.* Where the sole question in a former suit between lessees of water power is the quantity of water the defendant is entitled to receive, the judgment is not an adjudication of the manner in which the defendant shall be entitled to receive the water in his flumes.

4. CONTRACTS—*interpretation put upon contract by parties is entitled to great weight.* The practical construction placed upon a water-power contract by the lessor and lessee, under which the lessee, for a period of some sixty years, has taken water into his flumes at the bottom thereof under gates, should not be interfered with by the courts unless the course so pursued by the parties is inconsistent with a reasonable construction of the contract itself.

WILKIN, CARTWRIGHT and HAND, JJ., dissenting.

APPEAL from the Circuit Court of LaSalle county; the Hon. CHARLES BLANCHARD, Judge, presiding.

EDDY, HALEY & WETTEN, and JARVIS R. BURROWS, (CLYDE A. MORRISON, of counsel,) for appellants.

LESTER H. STRAWN, for appellees.

. Mr. JUSTICE BOGGS delivered the opinion of the court:

The appellees the Canal Commissioners of the Illinois and Michigan Canal of the State of Illinois, and the appellee the Ottawa Hydraulic Company, a corporation organized under the laws of the State of Illinois, filed this their bill in chancery praying for an injunction restraining the appellants, Louis W. Merrifield and George Galloway, his employee, and other persons and corporations, from removing weirs which the canal commissioners had placed or were about to place in certain flumes which had been constructed for the purpose of conveying water from the Fox river feeder of the Illinois and Michigan canal to certain industries operated by the defendants to the bill. The bill was dismissed as to all the defendants thereto except the defendants Merrifield and Galloway. A hearing on bill, answer, replication and proof resulted in a decree restraining the appellants substantially in accordance with the prayer of the bill. This is an appeal perfected to reverse the decree.

In 1838 the board of commissioners of the Illinois and Michigan canal were about to enter upon the work of constructing a "feeder" by which to convey water from Fox river southwardly from a point near the village of Dayton, on said Fox river, to the main channel of the canal at Ottawa, a distance of about four miles. John Green and William Stadden then owned the east half of section 29, town 34, north, range 4, east of the third principal meridian, at Dayton. This tract of land formed the west shore line of Fox river at the point where it was determined to begin the construction of the feeder to receive the water from said river. Said Green and Stadden, on the fifth day of June, 1838, executed an instrument in writing authorizing the canal commissioners to enter upon their premises and proceed to the construction of a dam and lock and other necessary structures in that part of the bed of Fox river to which the riparian rights of Green and Stadden extended, and also to

construct a "channel" on the said land for the purpose of receiving the water to be taken from the river, and conveying the same from thence to and discharging it in the Illinois and Michigan canal at a point some four miles below. The instrument reads as follows:

"Whereas, the board of commissioners of the Illinois and Michigan canal, in surveying different routes for a navigable feeder from the best practicable point on Fox river to the Illinois and Michigan canal at the town of Ottawa, and such basins of lateral canals connecting the Illinois river with said canal at that point as in their opinion will most enhance the value of the property of the State pursuant to an act entitled 'An act to amend an act entitled an act for the construction of the Illinois and Michigan canal, approved January 9, 1836,' have surveyed one route passing over the lands and premises of the subscribers:

"Now, therefore, we, the subscribers, for the purposes of encouraging the construction of said feeder, as also said canal, and also for the application of water to manufacturing purposes for the use of the State, or any person claiming, by purchase or otherwise, under the State, and as an inducement for determining on such route and location for said feeder and basins as will pass over or otherwise benefit our lands and premises, do hereby fully and absolutely release, acquit and discharge the People of the State of Illinois and the board of commissioners of said canal of and from all damages which we may sustain or might claim in consequence of the construction of the feeder and basins, or their or either of their fixtures and appendages, of whatsoever kind, at, on, over or through our lands and premises, and of and from all claims and demands for or on account of any lands, waters or streams that may be entered upon, taken or appropriated for the construction and use of the said feeder and basins and their fixtures and appendages: *Provided, however*, that these presents be understood with this limitation, viz.: That the subscribers forbear to relinquish, and hereby reserve to themselves, whatever claim or right they may have acquired to one-fourth part of the water that may flow in the Fox river, diminished as that quantity may chance to be, in the just measure of its proportion, by the leakage, evaporation, etc., necessarily incident to such good and workmanlike dam and lock structures as shall be deemed requi-

site for the said feeder and basins and useful to the State and after the necessary quantity has been drawn out for the purpose of the navigation of said canal, but agreeing that in the application or use of said fourth part aforesaid, the same shall be drawn out of said feeder within seven-eighths of one mile from the head of the guard lock, according as and in the manner to be directed by said commissioners or other authorized agents. This reservation being subject to the farther limitation that it shall not at any time authorize the subscribers, even within the quantity of said proportion, to reduce the water of the said Illinois and Michigan canal during the season of navigation below the depth of six feet, which, only, shall be done by the permission of some authorized agent of the State. They, the said subscribers, hereby relinquishing to the People of the State of Illinois, for the reasons and purposes assigned, as aforesaid, all and whatever right and claim they may have to the residue and all other portions or portion of the waters of the said Fox river beyond and above the one-fourth reserve as aforesaid, and they do hereby acquit and discharge the People of the said State of Illinois and the board of commissioners of the said canal from all liability whatsoever for the constant use and exercise of the rights and powers herein declared: *Provided*, if the board of commissioners shall alter or change the dimensions of said feeder as now located, the said board are to pay to said subscribers, or either of them, such damages as they may sustain in consequence of said change.

"In witness whereof we hereunto set our hands and seals this 5th day of June, in the year of our Lord, 1838.

JOHN GREEN,          (Seal.)

WILLIAM STADDEN.   (Seal.)

"Signed, sealed and delivered in presence of Giles Spring and James Turney."

A dam was constructed by the commissioners across Fox river at this point; also a lock at the dam on the premises of said Green and Stadden on the west side of the river; and the commissioners also dug the feeder from the lock to the outlet thereof in the canal at Ottawa. The feeder was, when constructed, a channel of the width of sixty feet at the top and forty feet at the bottom, and was capable of conveying water to the depth of five feet a portion of the way and four

feet the remainder of its length. Four flumes were by the commissioners put in the banks of the feeder within the limits of the Green and Stadden land for the purpose of receiving water for power uses reserved by said Green and Stadden. These flumes were constructed in 1838 or 1839, and remain in practically the same condition to this day. The water power reserved by Green and Stadden by proper assignments came to be owned, at the time of filing this bill, as follows: Three parts thereof by the appellant Merrifield, three parts by the Standard Fire Brick Company and two parts by the Columbia Straw Paper Company.

In 1852 the canal commissioners entered into a contract with the Ottawa Hydraulic Company, by which they purported to sell and lease to the Ottawa Hydraulic Company for a term of twenty years from the first day of May, 1852, so much of the water and water power furnished by the Fox river feeder to said canal as could be used, in the manner stated in said contract, by said Ottawa Hydraulic Company without interfering with an ample supply of water for said canal, and agreed that said Ottawa Hydraulic Company should have the privilege of using and sub-leasing the said water. At the expiration of this lease, in 1872, it was renewed for a further period of twenty years, and on the expiration of that term was again renewed for a third period of twenty years, thereby continuing the same in force until the first day of May, 1912.

On and before the second day of March, 1899, the appellant Merrifield had one of the flumes connected with a plant which he operated, for the purpose of generating electricity, and had another of the flumes connected with a tile factory owned by him, and drew water from the feeder through these two flumes for the purpose of operating the machinery at these respective plants. On said last mentioned date the Ottawa Hydraulic Company commenced an action of trespass on the case in the circuit court of LaSalle county against the appellant Merrifield for the purpose of fixing the respec-

tive rights of the parties thereto in said water and water power furnished by said Fox river feeder, and for the purpose of determining whether said Merrifield was using more water than he was entitled to. In said suit such further proceedings were had that on or about the first day of February, 1901, this court, by its judgment rendered in said cause, found said defendant, Louis W. Merrifield, guilty, and entered a judgment in favor of the plaintiff and against the defendant for one dollar and costs, only nominal damages being sought in said suit, which said judgment still remains in full force and effect.

After the termination of this litigation between appellant Merrifield and the Ottawa Hydraulic Company, the canal commissioners installed in each of the flumes by means of which Merrifield was drawing water from the feeder, a contrivance called a "weir," for the purpose of regulating the amount of water that should pass from the feeder through each of said flumes. The weir that was placed in the flume at the electrical power station was so constructed and installed as to give to said Merrifield all of the water power of said feeder which, in the opinion of the canal commissioners and according to the decision of the court in the trespass case brought against him by the hydraulic company, he was entitled to take, and the weir installed in the flume of the said Merrifield at his tile mill permitted him to use two-thirds as much water as the weir in the flume at said electrical power station. Such division of the water was made at the request of said Merrifield and upon his agreement not to use water through both flumes at the same time. The appellant Merrifield contended these weirs so obstructed the flow in the flumes as to deprive him at all times of a portion of the quantity of the water and of the "head" of water that he was entitled to receive under the Green and Stadden contract, and to deprive him at other times, when the stage of the water is low in the feeder, of all water whatever, and he and his co-appellant, George Galloway, an employee of his, removed

the weirs from the flumes. The canal commissioners notified said Merrifield and said Galloway that their action in removing said device was unlawful, and again put in said device in said flumes, and warned the said Merrifield and the said Galloway not to interfere with the same. Afterwards, in the night between the 10th and 11th days of March, 1901, the said Merrifield caused said device to be again destroyed and torn out, and the said Merrifield thereafter threatened that he would tear out and destroy any device or weir placed in his said flumes which would prevent him from using all the water he might need for his electrical power station. The canal commissioners replaced the weirs and filed this their bill to enjoin the removal of the same, and the decree appealed from granted the restraining order asked in the bill.

The appellant Merrifield contends that under the proper construction of the contract between Green and Stadden and the canal commissioners one-half of the water in the Fox river was to be diverted from that stream and caused to flow through the feeder, and that said Green and Stadden reserved the right to withdraw from the feeder and use for their own purpose one-half of the water so to be taken from the river, "diminished as that quantity may chance to be, in the just measure of its proportion, by the leakage, evaporation, etc., necessarily incident to such good and workmanlike dam and lock structures as shall be deemed requisite for the said feeder and basins and useful to the State and after the necessary quantity has been drawn out for the purpose of the navigation of the said canal, but agreeing that in the application or use of said fourth part aforesaid, the same shall be drawn out within seven-eighths of one mile from the head of the guard lock, according as and in the manner to be directed by said commissioners." The Ottawa Hydraulic Company, in the action of trespass brought against the appellant Merrifield, contended that under the true construction of the contract between Green and Stadden and the canal commissioners Green and Stadden reserved, and that

they and their heirs and assigns were entitled to, the one-
fourth part, only, of the water which came into the feeder
from the river, diminished as that quantity might chance to
be, by evaporation, etc., and for the purpose of navigation of
the canal, as specified in the contract. The canal commission-
ers construed the Green and Stadden contract as did the
hydraulic company.

It appeared from the transcript of the proceedings had
in the trespass case which the hydraulic company brought
against Merrifield, that the circuit court, in hearing and dis-
posing of that proceeding, gave to the Green and Stadden
contract the same construction contended for by the Ottawa
Hydraulic Company, and under such interpretation of the
contract entered judgment against Merrifield. The canal
commissioners accepted this interpretation and decision of
the circuit court as the true and legal meaning and construc-
tion of the Green and Stadden contract, and as fixing the
rights of Merrifield and the Ottawa Hydraulic Company in
respect of their rights, respectively, in the water which came
into the feeder.

It appeared from the record of the proceeding in the ac-
tion of trespass, that the issue was whether the appellant
Merrifield was receiving more water from the feeder than he
was entitled to take as an assign of the said Green and Stad-
den, and that the determination of this issue involved the
construction by the court of the provisions of the contract
between Green and Stadden and the canal commissioners in
respect of the reservation by Green and Stadden of the right
to use water from the feeder. The trespass case was heard
by the court without the intervention of a jury. The litigants
presented to the court propositions to be held as the law ap-
plicable to the contentions between them. These propositions
asked the court to construe and interpret the Green and Stad-
den contract according to the respective views of the parties.
The court refused to hold the propositions asked on behalf of
the appellant Merrifield and held that the propositions pre-

sented in behalf of the hydraulic company correctly construed the contract.

Proposition No. 1 asked by the hydraulic company and held by the court declared that under the proper construction of the Green and Stadden contract the water which the said Green and Stadden reserved "was the one-fourth part of the water of the Fox river which passed through the guard lock at Dayton, Illinois, into said feeder, diminished as that quantity might chance to be, according to the provisions of said release in that regard."

Proposition No. 2 presented in behalf of the hydraulic company and held by the court was as follows:

"That under the release of water power in question made by John Green and William Stadden, the said John Green and William Stadden, their heirs and assigns, did not become entitled to withdraw from the Fox river feeder a quantity of water equal to one-fourth part of all the water in the Fox river at Dayton, Illinois, only diminished by its proportion of leakage, evaporation and water for the navigation of the canal, as more particularly set forth in said release, even though such quantity of water might be all the water flowing in said feeder, but the true interpretation of the meaning of said release is, that said John Green and William Stadden, their heirs and assigns, are only entitled to withdraw from said feeder one-fourth of the water flowing in said feeder, and that one-fourth subject to the limitations and reductions set forth in said release, and said one-fourth subject to the further limitation and control of the canal commissioners or some authorized agent of the State, to the extent that the water of the canal should not be reduced below the depth of six feet during the season of navigation."

Other propositions giving the like construction to the contract were presented to the court by the hydraulic company and were approved as correct construction of the contract. It was then proven that the circuit court was called upon to decide, as one of the material questions in the case, the true

construction of the Green and Stadden contract, and that it did decide the point and enforced the contract in accordance with such decision, and that the judgment so entered remained in full force and in nowise reversed or impeached.

When one of the material questions involved in a suit at law has been adjudicated by a court of competent jurisdiction, though the judgment may not constitute a complete bar to a subsequent action, the adjudication is to be deemed a final and conclusive determination of that question in any subsequent suit between the same parties. (*Hanna* v. *Read,* 102 Ill. 596.) That is to say, as between the Ottawa Hydraulic Company and the appellant Merrifield the question as to the quantity of water Green and Stadden and their assigns were entitled to take under the correct construction of the contract with the canal commissioners arose for decision and was conclusively and finally settled in the trespass suit, and that the court in such litigation having decided that under said contract said Green and Stadden reserved for their own use and for the use of their heirs and assigns the one-fourth part, only, of the water which came into the feeder from Fox river, subject to be diminished by evaporation, etc., and after the necessary quantity had been drawn out for purpose of navigation of the canal, etc., that decision is final as between the parties to that litigation.

The Green and Stadden contract provided that in the application or use of the said one-fourth part of the water reserved by Green and Stadden, the same should "be drawn out of said feeder within seven-eighths of one mile from the head of the guard lock, according as and in the manner to be directed by the said commissioners." It was within the power of the commissioners of the canal to control and direct the withdrawal of the water from the feeder by Green and Stadden, and by the appellant Merrifield, the assign of Green and Stadden, and the commissioners having sold and leased to the hydraulic company all of the water and water power furnished by the said Fox river feeder which the said commis-

212—30

sioners could lawfully sell and which could be used without interfering with an ample supply of water for said canal, it became the duty of the said canal commissioners to take such steps as might be found proper to so control the withdrawal of water from the feeder by Merrifield as should be necessary to enable the hydraulic company to obtain the quantity of water it was entitled to have and use under the contract between it and the canal commissioners. Merrifield and the hydraulic company having submitted to a court of competent jurisdiction, in the action at law regularly pending between them, the question of the quantity of water Merrifield was entitled to have from the feeder under the proper construction of the Green and Stadden contract, and that construction having been settled by the judgment of the court, which judgment remained unreversed and in no manner impeached, the canal commissioners would be fully justified in taking such steps as might be necessary and proper to restrict the outflow of the water in Merrifield's flumes in accordance with his rights as determined by the court in the suit between himself and the hydraulic company. It was within the power and seems fairly to have been the duty of the canal commissioners to adopt some adequate and proper means to restrict the flow of the water into Merrifield's flume so that he should receive the quantity it had been determined by the court that he was entitled to use and enjoy under the Green and Stadden contract. The canal commissioners caused the weir in question to be constructed and placed in Merrifield's flume for the purpose of so controlling the flow of water from the feeder that he should withdraw no more than he was entitled to have and use under the decision of the court in the suit which the hydraulic company had instituted against him for the purpose of obtaining the judicial ascertainment and declaration of the rights of Merrifield under the Green and Stadden contract. Whether this weir was so contrived and constructed and so placed in the flume as to effect the correct apportionment of the water in the feeder demanded careful considera-

tion of the chancellor. Our investigation of the record as to this point has brought us to the conclusion that the appellant Merrifield had just cause to contend that the weir deprived him, during a portion of the time, of water which he was entitled to have flow into the flume, and that it deprived him at all times of the full benefit of what is known to the parties as the "head" of water.

The flume was built in 1838 or 1839, and, so far as the evidence discloses, no material change has since then been made in it,—certainly not since 1855, a period of more than forty years,—before any contention arose as to the rights of the assigns of Green and Stadden to take water from the feeder through the flume. The flume was constructed with a permanent stone bottom, which was put in on a level with the bottom of the feeder. The mouth of the flume was provided with two gates, which were moved up and down by cogs designed and made for that purpose. By means of the gates the quantity of water which would flow from the feeder into the flume could be restricted or the flow thereof entirely obstructed. The inside dimensions of the flume were seven feet in width by five feet in depth, and the bottom of the flume being on a level with the bottom of the feeder, the flume would therefore receive water whenever there was any water in the feeder, unless the gates were closed entirely down. The flume was of the length of twenty-five feet, the water being discharged from it into what is called the "penstock." The weir placed in the flume by the direction of the canal commissioners was so constructed that no water could flow through the flume into the pen-stock unless there was more than 3.2 feet of water, in depth, in the feeder. The flume as originally constructed in 1838 or 1839 and as maintained continuously from that early date received water from the bottom of the feeder whenever there was any water in the flume, unless the gates were closed down. The flume as maintained during the long years after its construction, before the Ottawa Hydraulic Company had contracted for water,

and for many years thereafter, received water from the feeder under conditions and circumstances under which no water could flow into it after the weir was installed. The flume, in the absence of the weir, received the water with a head of water at all times when water flowed into the flume at all, and this the weir interfered with and entirely destroyed or at least materially diminished. In these two respects the weir injuriously deprived the appellant of the full use and benefit of the water to which he was entitled. The engineer of the canal commissioners who devised the weir conceded that the weir would produce a "slight loss of head," but insisted that he had so designed the weir that the loss of head would be compensated for by an extra quantity of water which the weir would admit for that purpose. He also testified that the water in the flume between the weir and the feeder would have to rise to a depth of 3.2 feet before any water could pass over the crest of the weir into the pen-stock. Before the installation of the weir the feeder would receive and convey water at all times when the gates were raised, as the bottom of the flume and the bottom of the feeder were on the same level.

The adjudication created in the trespass case reached but a single question, namely, the quantity of water the assigns of Green and Stadden were entitled to receive from the feeder. The manner or mode in which they were entitled to take the quantity they had the right to receive was not brought in question in that action. Whether the weir permitted such assigns to receive the quantity in the mode and manner they were entitled to have it under the contract, remained to be determined by the chancellor in this proceeding. The chancellor was called upon to determine, among other things, (1) whether under the Green and Stadden contract it was competent for the commissioners to so divert and control the flow of water from the feeder to the flume, as did the weir, that no water could flow into the flume of the appellant Merrifield except at times when there was more than

3.2 feet of water in the feeder; and (2) whether under that contract it was competent for the canal commissioners to so construct the weir as to prevent the water from flowing into Merrifield's flume from the bottom of the feeder at all times when he was entitled to have water under the contract.

The provisions of the contract with Green and Stadden touching upon the propositions are as follows: "Agreeing that in the application or use of said fourth part, as aforesaid, the same shall be drawn out of the said feeder within seven-eighths of one mile from the head of the guard lock, according as and in the manner to be directed by the said commissioners or other authorized agent. This reservation being subject to the farther limitation that it shall not at any time authorize the subscribers, even within the quantity of said proposition, to reduce the water of the said Illinois and Michigan canal, during the season of navigation, below the depth of six feet, which, only, shall be done by the permission of some authorized agent of the State."

The contract, it will be observed, clothed the canal commissioners with authority and discretion in respect of these matters. Immediately after the execution of this contract of reservation by Green and Stadden the commissioners proceeded to construct the feeder and the flumes. The manner in which they caused the flumes to be made disclosed the views entertained by the commissioners as to the rights of Green and Stadden and their assigns in the mode and·manner of the use of the water reserved under the contract. The commissioners caused the flumes to be built with the stone bottom of the flume and the bottom of the feeder on an exact level. They caused to be framed in the mouth of each flume two gates, which could be raised or lowered. These gates could be shut entirely down and made to rest on the bottom of the flume, thereby, if both gates were down, excluding all water from the flume, or the gates, or either of them, could be partially raised, in which event the water would flow into the flume at the bottom thereof. The gates

provided the means of controlling and directing the flow of the water from the feeder into the flume, and were placed there for that purpose when the flumes were constructed. If controlled by the gates the water would enter the flume at the bottom whenever allowed to flow into it at all, and the water would always have a head of water in proportion to the depth of the water in the feeder. If the flumes thus operating should withdraw the water during the season of navigation to such an extent as to reduce the water in the canal to a depth of six feet or less, the commissioners could, in pursuance of the conditions of the reservation by Green and Stadden, close the gates of the flumes and thereby retain the water in the feeder so far as might be necessary to maintain the requisite depth in the navigable channel of the canal. The flumes remained as originally constructed, the gates constituting the means of controlling the inflow of the water, and the owners of the Green and Stadden water power were supplied with water in this manner during all the time after the construction of the canal until the weirs were installed. This was the condition and the mode of operation in force long before and at the time the Ottawa Hydraulic Company leased water rights from the canal commissioners, and so remained after the hydraulic company became interested in the quantity of water withdrawn from the feeder by these flumes until the weirs were designed and installed,—a period of more than forty years. The contract between the hydraulic company and the canal commissioners was entered into in 1852, and from thence forward until the weir was installed,—a period of more than forty-eight years,—the assigns of Green and Stadden continued to receive water from the feeder through the flumes in this manner. For a period of over sixty years the flumes have been maintained in the same condition, and those entitled to the water power have enjoyed such rights in the same beneficial mode and manner.

The manner of the construction of the flumes, the acts and conduct of the commissioners continuously since then, the uninterrupted enjoyment of the benefits thereof by the owners of the water, the knowledge and acquiescence on the part of the hydraulic company, constitute a practical exposition and construction by the parties of their rights under the Green and Stadden contract. In view of the great length of time, the uniform and continuous action and acquiescence of all the parties, the chancellor should have regarded the rights of all the parties as fixed by the construction which they have themselves placed upon the contract. They have determined and settled their respective rights by acts and conduct throughout so many years that the court should refuse to consider whether, under the contract, the commissioners have power to so change the flumes by weirs as to effectuate a radical change in the flow of the water into the flumes, to the injury of the appellant Merrifield. It is a doctrine frequently declared in cases where the rights and powers of contracting parties are the subject of investigation, that great weight will be given to such acts and conduct of the parties as are indicative of the construction they themselves have placed on their rights and powers under the contract, and not inconsistent with a fair and reasonable rendering of the contract itself. In 9 Cyc. p. 588, it is said: "Where the parties to a contract have given it a particular construction, such construction will generally be adopted by the court in giving effect to its provisions; and the subsequent acts of the parties showing the construction they have put upon the agreement themselves are to be looked to by the court, and in some cases may be controlling." The general principle there stated has been approved in many cases decided in this court and cited in note 45 to the text, and also collected in 2 Ill. Cyc. Digest, 677.

The flumes as constructed and so long allowed to remain and be enjoyed by the owners of the water power,

secured to such owners, at all times when they were entitled to receive water at all, such head of water as the depth of water in the feeder above the bottom of the flumes would afford. The weir practically deprived them of water and of this head at all times when there was less than 3.2 feet of water in the feeder, and when there was more than that depth of water in the feeder the weir deprived the appellant Merrifield of the head and substituted therefor an additional quantity of water. It is not and cannot be contended that under a proper construction of the contract the owners of the Green and Stadden water power were not entitled to water at all times when there was no more than 3.2 feet of water in the feeder. During the season of navigation this depth of water in the feeder may be requisite to secure the necessary quantity in the canal for navigation purposes, but the weir operates on the theory that this arbitrary depth of water must be maintained at all times in the feeder, and as a consequence, if installed, would deprive the appellant Merrifield of any water whatever unless there remained more than 3.2 feet in the feeder, whether such quantity was needed to maintain the necessary navigable depth in the canal or was otherwise necessary or useful for the purposes of the State. The contract reserves to Green and Stadden and their assigns the said one-fourth portion of the water in the feeder, diminished in just proportion by leakage, evaporation, etc., necessarily incident to a good and workmanlike dam and structure, etc., and useful to the State, "after the necessary quantity has been drawn out for the purposes of navigation," with the further limitation the reservation should not authorize Green and Stadden, or their assigns, to so draw the water from the feeder during the "season of navigation" of the canal as to reduce the water in the canal to a depth of less than six feet. The weir retains in the feeder at all times in each year, after the season of navigation has passed, water that the contract reserves to the use of the owners of the Green and Stadden water power, and even during the season

of navigation may prevent the flume from receiving water that is reserved by the contract and not needed to remain in the feeder in order to retain the requisite depth of water in the canal that may be needed for the purposes of navigation. The weir prevented the rightful passage of water into the flume and injuriously deprived the appellant Merrifield of the full use and benefits of the water power to which he was entitled. The chancellor therefore erred in holding the commissioners had power to place and maintain the weir in the flume.

The decree will be reversed and the cause will be remanded for such other and further proceedings, consistent with this opinion, as may to justice and equity appertain.

*Reversed and remanded.*

WILKIN, CARTWRIGHT and HAND, JJ., dissenting:

The principal legal questions in dispute in this case are whether appellant Merrifield is entitled to draw from the feeder a certain proportion of all the water flowing in Fox river or only of the water flowing in the feeder, and whether he has a prescriptive right to draw from the feeder as much water as was drawn therefrom by himself and his predecessors in title for a period of years. Both these questions are decided against him. It is held that the rights of the parties were settled in the action at law, and that it became the duty of the canal commissioners to take such steps as may be found proper to control and restrict the use of water by him to the proportion to which he is entitled. So far we concur in the foregoing opinion, but we do not understand that the commissioners are restricted to the use of gates because they were in use when Merrifield and his predecessors were permitted to take as much water as they chose and took more than they were entitled to. In our opinion the commissioners may adopt and install any device that will accomplish the desired result. What Merrifield is entitled to is a definite share of the water power supplied by the feeder, and if he

gets it in any way for practical use on his water wheels he has no cause for complaint. The evidence shows that a proper distribution of the water power by means of gates operated by an individual is not practicable. The amount of water flowing through a given space under gates depends upon velocity as well as volume, and is governed largely by the head or pressure of the water above. The head is lowered by opening the gates and releasing a portion of the water, and it is constantly changing in some degree. To make and maintain a just apportionment would require the presence and personal attention of an expert. The hydraulic engineer employed by Merrifield testified for him that the theory or system adopted by the commissioners for an automatic distribution of the water according to the rights of the parties was sound and correct, but that the form of the weir should be different and present a vertical side to the flow instead of a sloping one. Perhaps the form was objectionable, but according to the evidence there never was a time when the water did not flow over it, nor when Merrifield did not get more water and water power than his just proportion. The crest of the weir was 3.56 feet below the crest of the dam, and the evidence did not show that there had been or would be a time when water would not flow over the weir. If there was some loss of head as compared with the use of gates it was fully compensated for by the increased amount of water, and the full share of water power was furnished. If there was a better form of weir it might properly be adopted, but Merrifield himself proved that a weir is the proper means of controlling the distribution of the power.